IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CATHETER CONNECTIONS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br><br>IVERA MEDICAL CORPORATION,<br><br>Defendant. | ORDER AND<br>MEMORANDUM DECISION<br>DENYING<br>SECOND CONTEMPT MOTION<br><br><br>Case No. 2:14-CV-70-TC |

This patent infringement and unfair competition lawsuit focuses on medical devices used to sterilize the ends of intravenous (IV) lines that deliver medicine or other fluids to patients. Plaintiff Catheter Connections, Inc. and Defendant Ivera Medical Corporation are direct competitors.

Catheter Connections has filed a motion seeking a contempt order and sanctions against Ivera, arguing that Ivera has failed to cure its original contempt (on September 11, 2014, the court found Ivera in contempt for violating the preliminary injunction order on patent infringement[1]).  For the reasons set forth below, the court DENIES Catheter Connections' Motion to Find Ivera in Contempt of the Court's September 11, 2014 Contempt Order.

---

[1]See Doc. No. 277.

## FACTUAL AND PROCEDURAL BACKGROUND

In early February 2014, Catheter Connections filed a motion for preliminary injunction, in which it alleged that Ivera had infringed one of Catheter Connections' patents.  On April 25, 2014, the court granted the motion and entered a preliminary injunction that prohibited Ivera from manufacturing, selling, or distributing the X13 version of its Curos Tips device because it infringed a patent held by Catheter Connections.  (See Preliminary Injunction Order (Doc. No. 98) [hereinafter "Preliminary Injunction"].)  The Preliminary Injunction also prohibited Ivera from selling any device that was "no more than colorably different" from the enjoined device. (Id. at 2-3.)

On May 15, 2014, Ivera began selling and distributing a redesigned version of its Curos Tips product, referred to internally as the Rev. G model.  On May 23, 2014, Catheter Connections filed a motion for an order to show cause ["First Contempt Motion"] why Ivera should not be held in contempt for selling the Rev. G model because, according to Catheter Connections, the Rev. G was not more than colorably different from the enjoined X13.  On July 17, 2014, Ivera stopped selling Rev. G and instead began selling a new model called Rev. H. Nevertheless, Catheter Connections' motion was relevant to the period during which Rev. G was sold.

The court held a hearing on the First Contempt Motion, and, on September 11, 2014, issued an order finding that the Rev. G device "is not more than colorably different from the enjoined Curos Tips device" and, consequently, Ivera had violated the Preliminary Injunction by selling the Rev. G model.  (See Sept. 11, 2014 Contempt Order (Doc. No. 277) at 9 [hereinafter "Contempt Order"].)  In the Contempt Order, the court set forth steps Ivera had to take to purge

2

itself of contempt and to remedy harm to Catheter Connections caused by the contemptuous

behavior.  In particular, the court ordered Ivera to do the following:

> Immediately recall all of the Rev G caps from all of the distributors to whom Ivera
> sent the Rev G Caps.  No later than 30 days from the date of this order, Ivera must
> submit a sworn statement by a representative of the company indicating that the
> recall was successfully completed.

(Sept. 11, 2014 Order & Mem. Decision (Doc. No. 277) [hereinafter "Contempt Order"] at 9.)[2]

During the hearing on the Rev. G contempt matter, Catheter Connections plainly stated

that it did not seek a remedy requiring recall from end users (85% of Ivera's sales of Rev. G were

to independent third-party distributors and 15% of sales were to end users such as hospitals).  It

focused its recall request on Ivera's distributors who still had Rev. G in stock, not on end users

who had purchased directly from Ivera or from one of Ivera's distributors.  During the initial

contempt hearing, counsel for Catheter Connections stated that "we're not asking for a recall all

the way down to the hospitals, but at least distributors."  (Aug. 4, 2014 Tr. of Contempt Hearing,

attached as Ex. A to Ivera's Opp'n to Mot. Contempt (Doc. No. 261).)

On September 16, 2014, Ivera sent a letter to each of its distributors who had purchased

the Rev. G product.  Ivera spent the time between the Contempt Order and the letter compiling

all of the data necessary to identify the particular lots and purchase orders that included

shipments of Rev. G caps to its distributors.  The substance of the letter to each of the

---

[2]Ivera was also ordered to pay Catheter Connections' lost profits and attorneys' fees and
costs.  That portion of the contempt order is still being resolved, although Catheter Connections,
in its recent motion for contempt, complains that Ivera, through the discovery process, has made
it unduly difficult to gather information necessary to calculate lost profits.  The court told
Catheter Connections to file a motion to compel and will not address discovery disputes in this
order.

distributors was the same (the only difference being identification of the specific product

inventory that the particular recipient needed to return).  In the letter, Ivera said, in relevant part:

> Ivera was recently ordered [by the U.S. District Court for the District of Utah] to
> recall from distributors a discontinued version of its Curos® Tips™ product . . . .
> **The order is not related to any concern regarding the safety or efficacy of the**
> **product, and does not extend to product distributed to end-users.  The order**
> **also does not relate to or affect in any way the current version of Curos Tips.**
> As a distributor who received product within the scope of the Court's order, we
> ask that you immediately return to Ivera any remaining inventory of Curos Tips
> that were shipped between May 14, 2014, and July 11, 2014 . . . .

(Sept. 16, 2014 Sample Recall Ltr. (Ex. A to Docket No. 307) (emphasis in original).)  Ivera also

asked each recipient of the letter to confirm in writing that either its returns represented all of the

recalled product in its possession, or it had no recalled product in its inventory.  Attached to each

letter was a list of product information compiled by Ivera to assist the distributor in identifying

product that had been recalled and that needed to be returned to Ivera.  Each distributor was

asked to return all identified product still in its possession to Ivera at Ivera's expense.

On October 10, 2014, thirty days from the date of the Contempt Order, Ivera submitted a

Verified Status Report (see Doc. No. 307) setting forth, in detail, Ivera's efforts to comply and

the results of its efforts at that point.  Ivera listed distributors, the nature of communications, the

amounts of product shipped, the amounts of product returned, and outstanding amounts of

product yet to be returned (some of the distributors had not completely responded by the end of

the thirty day period).  Ivera emphasized that it does not have the ability to force distributors to

comply with the recall notice, but it did say that it would "continue to pursue return of all Rev. G

from such distributors in accordance with this Court's order."  (Id. at 11.)

Based on the content of the Verified Status Report and the incomplete recall, Catheter

Connections filed a second motion for contempt, arguing that Ivera failed to comply with the initial Contempt Order.

## <u>ANALYSIS</u>

Plaintiff Catheter Connections moves this court to find Defendant Ivera in civil contempt and order certain sanctions.  (<u>See</u> Doc. No. 320 [hereinafter "Second Contempt Motion"].)  "A contempt sanction is considered civil if it is remedial and for the benefit of the complainant." <u>Fed. Trade Comm'n v. Kuykendall</u>, 371 F.3d 745, 752 (2004) (internal citations and quotations omitted).  <u>See also</u> 18 U.S.C. § 401(3) (giving court power to "punish by fine or imprisonment, or both, at its discretion such contempt of its authority [such as] disobedience or resistance to its lawful . . . order. . . .").

To prevail on its motion for contempt, Catheter Connections "has the burden of proving by clear and convincing evidence, that a valid court order existed, that [Ivera] had knowledge of the order, and that [Ivera] disobeyed the order."  <u>Reliance Ins. Co. v. Mast Constr. Co.</u>, 159 F.3d 1311, 1315 (10th Cir. 1998) (internal citation omitted).  A party will not be held in contempt if it was "reasonably diligent and energetic in attempting to accomplish what was ordered."  <u>Bad Ass Coffee Co. of Haw., Inc. v. Bad Ass Coffee Ltd. P'ship</u>, 95 F. Supp. 2d 1252, 1256 (D. Utah 2000).

Ivera admits that the Contempt Order is valid and that it had knowledge of the Contempt Order.  But it contends that it did not disobey the order, because Ivera was "extremely diligent and energetic in its efforts to comply."  (Ivera Sealed Mem. Opp'n Mot. Contempt (Doc. No. 330) at 1.)  The court agrees and finds that Catheter Connections has not satisfied its heightened burden of proof.

Catheter Connections presents two bases for finding Ivera in contempt.  First, Catheter

Connections accuses Ivera of using language that "suggested to distributors that they could dump

product on end-users rather than return it pursuant to the Court's recall order." (Id. at iii.)

Catheter Connections points to the following language in the letter: **"The order is not related to**

**any concern regarding the safety or efficacy of the product, and does not extend to product**

**distributed to end-users."**  (Sample Recall Letter at 2 (emphasis in original).)  To further

support its position, Catheter Connections contends that the relatively small amount of product

returned is evidence that the Rev. G product was "dumped" on end users.  It notes that the letter

did not contain "a corresponding instruction not to ship further product to end users" and that

Ivera's nineteen-day delay allowed distributors as much time as possible to dump Rev. G.

(Second Contempt Motion at v.)  But Catheter Connections' characterization of the letter as "a

wink and a nod" is not a reasonable reading of the letter.  The plain language simply does not

invite such an interpretation, and, as Ivera credibly notes, Ivera included that language because it

"believed it was important to clarify that the recall ordered by the Court did not extend to end-

users to avoid any confusion as to whether the recall was based on safety concerns. [Ivera's] goal

was to make sure that the distributors had a clear understanding of the scope of the Court's order

. . . ." (Mem. Opp'n (Doc. No. 330) at vii.)  In addition, Ivera persuasively explained the reason

for the relatively small amount of product recalled:

> Ivera is not surprised by the small amount of product that was held by its
> distributors at the time of the recall of Rev. G on September 16 and September 17.
> Ivera had only shipped Rev. G for approximately two (2) months and had not
> shipped any Rev. G since July 17, 2014.  Additionally, Ivera does not impose
> minimum order requirements on its distributors and, thus, they do not have a
> reason to stock their inventory with more than is needed.  The distributors
> generally appear to order product on an as-needed basis to fulfill orders from their

customers.

(Id. at ¶ 27, viii-ix.)  Catheter Connections' speculation is not supported by the evidence.

Second, Catheter Connections complains because the status report expressly shows that not all product was recalled by the 30-day deadline set by the court.  Catheter Connections blames that in part on the nature of the recall letter's language, which, it contends, did not convey the urgency of the recall.[3]  The fact that the recall letter did not mention the Preliminary Injunction or the Contempt Order and did not include a response deadline, Catheter Connections contends, "lead[] distributors to believe the matter deserved less attention than it did."  (Second Contempt Motion at p. ii.)  The court finds that the text of the letter and Ivera's fulfillment of its obligations substantially complied with the court's directive by the October 10, 2014 deadline.[4]  Ivera fully acknowledged that it had not fully complied with the court's order within the 30-day time frame.  The court accepts Ivera's representation that its efforts to comply within the 30-day window were somewhat thwarted by the procedures its distributors had in place.  Perhaps Ivera could have been more "energetic" in its follow-through (for example, the court would have preferred that Ivera clarified the reason for the recall and stated that it was bound by a deadline set by a federal district court), but Catheter Connections' suggestion that Ivera was lax in its efforts is simply not supported by the evidence.

Catheter Connections cites to the case of Bad Ass Coffee Company of Hawaii, Inc. v. Bad

---

[3]Catheter Connections also contends that Ivera turned the recall letter into a marketing tool, noting that the letter contained language that Ivera's competing product performed better than Catheter Connections' product.  That aspect of the letter is not relevant to the contempt issue.

[4]At worst, the text contained unnecessary language.  But that is not sufficient to find Ivera in contempt.

Ass Coffee Ltd. Partnership, 95 F. Supp. 2d 1252 (D. Utah 2000), to support its argument.  In that case, the court found the defendant in contempt for violation of a preliminary injunction that barred it from using or displaying the Bad Ass Coffee name and logo in Hawaii and from selling goods and products labeled with the Bad Ass Coffee name and mark from retail stores in Hawaii. But Bad Ass Coffee is distinguishable on its facts.

In that case, the preliminary injunction, which went into effect immediately (on February 23), was faxed to Robert Jones, President of the General Partner of the defendant, within two days from the date the injunction was entered.  Mr. Jones, who said he did not receive the order until three days after it was faxed, sent out a less-than-complete memorandum to managers for the three stores affected by the injunction.  He only told his managers that the name of the stores was being changed and that he would make arrangement with individual stores regarding signs and inventory.  He directed questions about the name change to him.  He did not mention the injunction or provide specific instructions to remove products and signs displaying the Bad Ass Coffee name and logo.  Although he flew to Hawaii from Las Vegas the day after his memorandum to oversee compliance, during the thirteen days he was there he dedicated some of his time to pressing matters relating to a client's sudden death and to his acquisition of a coffee farm.  When he left Hawaii, and afterwards, some Bad Ass Coffee products were still being displayed and sold (apparently some store managers were reluctant to comply with the instructions) as late as March 29, over a month after the injunction had been entered.  The court held that the defendant was in contempt even though it was in "substantial compliance" by March 29th.  The court noted that the defendant failed to completely comply over a month later even though the injunction set forth "straightforward directives."  Bad Ass Coffee, 95 F. Supp.

8

2d at 1256.  Throughout all of this, Mr. Jones had control over his agents who were to implement the instructions he gave.

Here, Ivera's letter to its distributors (over whom Ivera ultimately has no control) communicated urgency (use of the word "immediately"), and was very specific about what to do with the recalled items (including providing a list tailored to the particular distributor).  Although the court's directive was straightforward, the method by which Ivera had to implement it was, understandably, not straightforward.  In Bad Ass Coffee, carrying out the court's order to remove products from shelves and take down signs in stores was much simpler than what Ivera had to do: contact nationwide distributors to recall medical devices identified by lot number and to assure performance by independent third parties.

Also, in Bad Ass Coffee, the owner's communications to his stores was vague, and he dragged his feet, showing less-than-energetic efforts to get his stores to comply with the injunction.  Here, Ivera moved quickly.  As soon as the court issued its order, Ivera began gathering product distribution information (such as quantities, shipment dates, lot numbers), compiled that information in a form that could be attached to a letter customized for each distributor, and mailed the recall letters within five to six days of the court's order.  If offered to pay the distributors' costs, followed up within days, and contacted distributors multiple times to coordinate the recall.  On October 10, 2014, Ivera timely filed its status report with the court, and although it candidly reported less than complete compliance, it demonstrated substantial compliance and continuing good faith efforts to complete the recall.  The court finds that at the time of the status report Ivera had substantially complied with the court's order.  A defendant may avoid a finding of civil contempt "by showing by clear and convincing evidence that 'all

reasonable steps' were taken in good faith to ensure compliance with the court order and that there was substantial compliance, or related by proving 'plainly and unmistakably' defendants were unable to comply with the court order." <u>Bad Ass Coffee</u>, 95 F. Supp. 2d at 1256 n.8. Moreover, by the time Ivera responded to Catheter Connections' Second Contempt Motion (<u>see</u> Ivera's Nov. 7, 2014 Mem. Opp'n (Doc. No. 330)), "[a]ll Rev. G sent to distributors [was] accounted for and [had] either been returned or [was] in the process of being returned (3 ½ cases)." (<u>Id.</u> at ix.)  And by the time the court held its December 9, 2014 hearing on Catheter Connections' Second Contempt Motion, counsel for Ivera represented in good faith that the loose ends noted in the status report have since been resolved.

Ivera accomplished what was necessary to complete the recall.  There is nothing more to do.

Yet Catheter Connections requests additional remedies and penalties.  First, it asks that Ivera issue a second recall letter and that Ivera post that letter on its website.  Second, it asks that Ivera be required to recall Rev. G from direct end users.  Third, it requests a certification that there have been no other sales of the Rev. G model.  Fourth, it asks for an order compelling discovery that is responsive to Catheter Connections' requests.  Fifth, it asks for an award of additional attorneys fees and treble damages, as well as disgorgement.  Finally, it asks for a supplemental status report.

The above remedies are inappropriate because (1) Catheter Connections has not satisfied its clear-and-convincing evidentiary burden to prove contempt; (2) the actions requested would go above and beyond what the court ordered Ivera to do (they do not relate to any obligations in the Contempt Order); (3) the requested remedies would not accomplish anything (all that was

required to be done has been done and there are no recipients to whom a second recall letter would be sent); and (4) sending a second recall letter would cause confusion.[5]

The purpose of contempt is to coerce compliance and remedy harm, if any, to the other party.  Catheter Connections asks the court to impose sanctions (for example, disgorgement and additional attorneys' fees).  But there is nothing left to coerce.  And there is nothing compensable, for Ivera has complied.

## ORDER

For the foregoing reasons, Catheter Connections' Motion to Find Ivera in Contempt of the Court's September 11, 2014 Contempt Order (Doc. No. 320) is DENIED.

DATED this 7th day of January, 2015.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

_____

[5]"All Rev. G sent to distributors has now been accounted for and has either been returned or is in the process of being returned (3 1/2 cases).  No further communication with distributors on this issue is necessary.  In fact, Ivera believes more communication will do nothing more than cause confusion by giving the impression that additional action is necessary when it is not." (Opp'n Mem. at ¶ 28.)